IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

WILLIE LITTLETON                                                                    PLAINTIFF

v.                                         No. 3:04CV00224 GH

PILOT TRAVEL CENTERS, LLC                                              DEFENDANT

## ORDER

On June 23, 2004, plaintiff filed a pro se Title VII lawsuit alleging discrimination based on his race and color in not receiving a raise and for retaliation in being given a letter of correction without investigating the charges. A first amended complaint was filed by counsel on October 13th adding claims under the Americans with Disability Act "(ADA"), the Arkansas Civil Rights Act ("ACRA"), and for the tort of outrage.

Defendant filed a motion for summary judgment on May 9th supported by brief, exhibits and a separate statement of undisputed facts. It asserts that there is no adverse action in holding plaintiff's wage rate flat for a period of time after his transfer to West Memphis given the differential between his compensation and the wage rate paid to other more senior transport drivers performing the same job or in his payroll being occasionally miscalculated when it was always corrected so he was accurately paid. Defendant argues that plaintiff cannot prove that he was treated differently than similarly situated non-black employees since he must point to a comparable white transport driver who was performing the same job, with the same background and experience, reporting to the same supervisor and without any mitigating or distinguishing circumstances, but who received the benefit

that was denied to plaintiff.  It continues that plaintiff relies upon three white transport drivers as comparators.

Defendant points to plaintiff admitting that he has no evidence whatsoever regarding Porter Beach, he does not know why Beach was removed from his lead driver position, whether he has received raises since his demotion, and how much he is actually paid.  It states that Beach was a hired as a lead driver in 1990 and only resigned his lead driver responsibilities because of a heart condition and he is not employed in West Memphis.  As to Howard Brown, he was employed for almost twenty years in Nashville with ten of those years in a lead position and also resigned lead responsibilities for health-related reasons.  There were no complaints from more senior employees regarding their wage rate.  Based on the differing backgrounds, physical conditions, tenure and performance, defendant asserts that plaintiff cannot argue that they are similarly situated.

Defendant continues that Eric Meyer is the only employee that would be comparable to plaintiff and they were treated the very same way as both are employed in West Memphis, both were relieved of their lead driver responsibilities due to performance-related concerns, both kept their lead driver salary which were held flat as transport drivers as they earned substantially more than co-workers in the same location.  It states that Breeding – after consultation with Dyer – decided to manage comparative compensation and conflicts that had developed until the more senior co-workers could catch up and that in light of that nondiscriminatory reason for its actions, plaintiff must produce sufficient evidence to support a reasonable inference of pretext.  Defendant argues that plaintiff has no evidence of racial animus, he cannot dispute the differences in his situation and those of Beach and Porter, and his subjective belief and personal perceptions do not create a triable issue of fact.

Turning to retaliation, defendant contends that defendant has no evidence of a an adverse employment action as he is relying solely on the fact that defendant issued him a Correction Notice on October 2, 2003 relating to concerns raised by the Transport Center employees regarding his conduct and that counseling form had no impact whatsoever on his wages or benefits, there is no evidence of causation since Dyer was not aware of plaintiff's Charge filed seven months earlier, and plaintiff admits that complaints were made about him although he argues whether the Travel Center employees' concerns were justified.

Defendant contends that plaintiff does not have a claim under the ADA as plaintiff never filed a Charge alleging such discrimination, he admits that he is not disabled, and he does not believe that he was discriminated on the basis of any purported disability even if he believes they violated 29 C.F.R. §1630.14(b) by storing his medical information in his personnel file.  As to the outrage claim, defendant asserts that plaintiff cannot meet any of the required elements as he has no evidence that either Dyer or Breeding intended to inflict emotional distress when the compensation decision was made especially when Dyer had received complaints from more senior drivers regarding plaintiff's wage rate as the highest paid driver in West Memphis with the least amount of seniority and that plaintiff did not testify to severe emotional distress, just that the experience had been stressful and he occasionally has difficulty sleeping.

On June 6th, plaintiff filed a response supported by brief, exhibits and a response to defendant's statement of material facts.  He contends that there are genuine material fact issues as to whether pay raises that were denied to plaintiff were granted to similarly situated white employees, whether a sham Correction Notice was created in retaliation to set him up for termination, consistent shorting of his paycheck, and making false statements to the EEOC regarding

his job performance and its investigation into the allegations supposedly supporting the defendant Notice.  Plaintiff contests the Breeding's affidavit as conflicting with this deposition testimony and so should not be considered by the Court.  He argues that much of the evidence of defendant's explanations are false, there is no evidence that before he filed his EEOC charge regarding denial of raises that Breeding or Dyer ever told plaintiff that his performance as Lead Driver was deficient or that its raises were anything other than cost of living adjustments; that he was treated differently than Brown, Beach and Meyer with respect to raises with the multiple explanations shifting; Breeding and Dyer's versions of whether plaintiff was told before the transfer – not demotion since there is nothing in the record to so indicate – that he would not be receiving a raise conflict; and defendant initially failed to disclose that Brown, Beach and Meyer had all received raises after being transferred from Lead Driver to Transport Driver.

As to retaliation, plaintiff contends that Breeding was disinterested in whether the allegations made by Tommy Bradshaw were true and that plaintiff's affidavit and deposition, the dates of the Correction Notice, the dates of the supporting statements, statements of witnesses denying that they had been asked about the charges, and Parmly's response create fact questions as to whether defendant was trying to find a pretext to get rid of plaintiff.  He continues that his pay was shorted on a regular basis and the humiliation and stigma is sufficient for an adverse employment action.

Plaintiff withdraws his ADA claim and moves to dismiss it without prejudice leaving that to the EEOC.  As to outrage, plaintiff points to defendant's EEOC response that treating white drivers differently than black drivers would be utterly objectionable and reflecting a sentiment out of place in a modern work force says it best that discrimination, retaliation against the victim and falsification of his job performance cannot be tolerated in a civilized society.

Defendant filed a reply on June 17th that while plaintiff disputes many of the facts, he fails to cite record evidence in support such as Ben Crow complained about his behavior at the Travel Center and Bradshaw advised Dyer that he had spoken to other employees about Crow's complaints. It continues that Breeding's deposition is not contradictory but merely more detailed after he had an opportunity to review further records.

Defendant states that plaintiff has made no effort to compare himself to Beach in Chattanooga or Brown in Nashville since they had more than fifteen years as employees and ten years as Lead Drivers and both resigned due to health concerns and while Meyer can be reasonably compared to plaintiff, they were both treated the same way in receiving raises despite performance problems, their wages being held flat after removal from the lead role, and plaintiff continued to earn more than Meyer – his former supervisor.  It contends that there is no evidence of racial motivation in holding his wages flat as he was earning substantially more than all his more senior co-workers – including his supervisor – in 2001.

Turning to retaliation, defendant argues that the counseling form that plaintiff received had no impact on his wages or benefits and so was not a materially disadvantageous change when he was told to behave when interacting with Travel Center employees.  Defendant asserts that it is undisputed that Bradshaw, the manager of the Travel Center advised Dyer that he had received complaints and Dyer and Breeding could reasonably rely on his conclusion that misconduct had occurred although Dyer did meet with plaintiff and listened to his side of the story before counseling him to avoid further conflict with the Travel Center employees.  As to the claim of outrage, Defendant states that the Eighth Circuit has expressly held that allegations of discrimination do not meet that standard and that plaintiff has only suffered moderate stress.

Summary judgment can properly be entered when there are no genuine material facts that can be resolved by a finder of fact; that is, there are no facts which could reasonably be resolved in favor of either party. The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2512 (1986). The non-moving party may not just rest upon his or her pleadings, but must set forth specific facts showing that there is a genuine issue for trial. Celotex Corp. v. Catrett, 106 S.Ct. 2548 (1986); Civil Procedure Rule 56. "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather the dispute must be outcome determinative under prevailing law." Holloway v. Pigman, 884 F.2d 365, 366 (8th Cir. 1989).

Local Rule 56.1 provides that a party moving for summary judgment must file a separate, short and concise statement of material facts as to which it contends there is no genuine issue to be tried. The rule further provides that unless the non-moving party files a separate, short and concise statement of the material facts as to which it contends a genuine issue exists to be tried, all material facts set forth in the moving party's statement will be deemed admitted.

The defendant's Local Rule 56.1 statement is set out below with plaintiff's response in brackets:

1.      Pilot Travel Centers LLC, ("Pilot") is the nation's largest operator of travel centers and largest seller of over-the-road diesel fuel. Pilot owns and operates over 250 travel centers in 37 state coast to coast. [Plaintiff agrees.]

2.      Pilot is an equal opportunity employer that prohibits discrimination on the basis on race with respect to all aspects of employment, including compensation. Employees who believe that

they have been subjected to discrimination are instructed to immediately contact Human Resources.  [Plaintiff agrees that defendant has such written policies in place, but denies that they were followed by defendant in dealing with plaintiff.  Plaintiff tried to call David Parmly in Pilot's HR twice, but Mr. Parmly never returned his calls.  Plaintiff further cites the record to date and disputes that defendant actually follows its written policies.]

3.      Pilot operates its Travel Centers and its fuel transportation services as separate divisions within the Company.  Mangers within the Transportation Department have no authority or supervisory responsibility over Travel Center operations.  [Plaintiff agrees.]

4.      Within the Transportation Department, Pilot employs transport drivers who haul diesel fuel from refineries to Pilot Travel Center service stations.  Transport drivers are responsible for leading their trucks with fuel, transporting the fuel from a depot or refinery to designated Travel Centers, and unloading the fuel.  [Plaintiff agrees.]

5.      Pilot also employs lead drivers in certain geographic locations.  In addition to transport driver responsibilities, lead drivers are responsible for maintaining Pilot's trucks, ensuring proper paperwork, and forwarding payments to Pilot's corporate offices. [Plaintiff notes that the statement is misleading because notwithstanding his title as Lead Driver in Troy, Illinois, plaintiff was the *only* driver in Troy.]

6.      When setting base compensation rates for transport drivers, Pilot considers the geographic area where that driver will be employed.  Pilot considers raises for transport drivers annually in January.  Increases are based upon factors including cost of living, geographic location, and job performance.  [Plaintiff disputes statement 6.  Breeding's affidavit is contradicted by his deposition testimony, the fact that Eric Meyers received a raise at the same time

defendant asserts that he was demoted, and the absence of any identifiable criteria on which to base the raises if they involved either geographic areas (*e.g.*, no indices or market surveys) or merit (*e.g.*, Meyers' raise at the same time he is purportedly being demoted in 2003.)  See also Pilot 157 (E-mail from Breeding to Parmly (April 3, 2003), stating that raises are generally cost of living adjustments.).]

7.     Littleton applied for employment with Pilot on August 18, 200.  Randall Dyer, a Pilot Regional Manager, hired Littleton as a transport driver in Chattanooga, Tennessee, and he was paid a starting rate of $10.00 an hour.  [Plaintiff generally agrees, but all hiring, pay, transfer, and employee discipline decisions are ultimately approved by David Breeding.  In addition, the statement is misleading because Littleton was sent to Chattanooga for training and was paid $10.00 per hour during his training period.]

8.     Dyer recommended Littleton for lead driver position in Troy, Illinois, where he had several years of prior experience as a truck drier.  Within two months of his hiring, Littleton transferred to Troy as a lead driver, and his wage was increased to $13.50/hour.  In January 2001, Littleton received a raise to $13.90/hour.  [Plaintiff generally agrees, bu the statement is somewhat misleading because there was only one driver in Troy, Illinois.]

9.     In Troy, Littleton was supervised by Nick Peaker, who reported to David Breeding, Pilot's Director of Transportation.  Littleton testified about problems he experienced as the lead driver in Troy, which he blames on leaking storage tanks to the Travel Center.  [Plaintiff admits statement 9, but denies that he was ever informed that his performance was deficient.]

10.    Breeding was unhappy with Littleton's job performance in Troy.  The Troy location was not profitable, and Littleton was responsible for generating revenue at that location.  Breeding

wanted to make a change in Troy, and he decided to transfer Littleton to West Memphis, Arkansas.  [Plaintiff disputes statement 10.  See Littleton Affidavit.]

11.    Breeding told Littleton that he could keep his lead driver wage after his transfer to West Memphis.  Littleton understood that he was transferring from a lead driver position back to a transport driver position.  He moved to West Memphis in June 2001.  [Plaintiff generally agrees, but disputes the statement to the extent that it states that moving from Lead Driver to Transport Driver is considered a demotion by Pilot as Brown, Beach, and Meyer were not considered demoted and absence of any Employee Action Notice in plaintiff's personnel file reflecting a demotion.]

12.    When Littleton arrive in West Memphis in June 2001, he was supervised by Eric Meyer, the lead driver in that area.  Meyer is white.  Meyer reported to Dyer, the Regional Manger who had originally hired Littleton in Chattanooga.  [Plaintiff agrees, but everyone ultimately reported to David Breeding, who determined all pay issues and raises.]

13.    At $13.90 per hour. Littleton was the highest paid transport driver in West Memphis when he arrived, despite the fact that all the other drivers had more seniority with the Company. Littleton's wage rate was even higher than his supervisor's (Meyer's) hourly rate of pay. [Plaintiff agrees, but Breeding had stated that plaintiff's pay would be unaffected and that he would continue to receive raises, Breeding made all decision regarding driver pay, Breeding used no market surveys or economic data evidencing his contention that Pilot considered individual markets in determining wage rates,  Brown's wage rate was greater than plaintiff's, and raises were considered cost of living adjustments and generally made across the board.]

14.    Dyer discovered soon after Littleton's arrival in West Memphis that his wage rate was the subject of discussion among other drivers, and Dyer perceived conflict regarding this issue because Littleton was paid more than other senior employees, including his supervisor.  Dyer received complaints from three different drivers in West Memphis regarding the fact that Littleton was paid more to do the same job.  [Plaintiff disputes statement 14.  Plaintiff never disclosed his pay rate to any other Pilot employee and never heard any other employees in West Memphis grumble or complain about his pay rate.  The fact that defendant failed to disclose the fact during the EEOC investigation or Dyer's and Breeding's failure to mention this during their depositions, calls into question whether the statement is believable or merely contrived after the fact.]

15.    In February 2002, Pilot demoted Meyer from his lead driver position due to poor performance.  Like Littleton, Meyer retained his lead driver wage rate following his demotion.  [Plaintiff disputes statement 15.  Defendant gave Meyer a raise on January 31, 2002 (or in February 2002, given that it appears that part of the date is scratched through) at the same time it claims it was demoting Meyer from Lead Driver (or not demoting if Dyer is believed).  The decision to give the raise was made by Breeding at the same time he was deciding to demote Meyer and was not effective until after Meyer was demoted.  Furthermore, Breeding's memo to Parmly states that he was demoting Meyer at the same time he was transferring plaintiff, which would have been in mid-2001.  In that case, according to Breeding's own records, Meyer was clearly given a raise in 2002 *after* he was supposedly demoted, while plaintiff continued to be denied the cost of living raise.]

-10-

16.     Breeding and Dyer decided to promote Cedric Clark to the lead driver position.  Clark is black.  Littleton has had no difficulty with Clark's supervision.  [Plaintiff agrees.  Indeed, in 2004 Clark told plaintiff that he was the highest-rated Transport Driver in West Memphis in the annual evaluation, but plaintiff received no raise in 2004.  No driver evaluation was given in 2005.]

17.     Pilot typically makes compensation decision for its drivers in January.  [Plaintiff disputes statement 17.  Breeding had told Littleton in June 2001 that Littleton would continue to receive his raises after transferring to West Memphis.]

18.     In 2002, Breeding decided that Littleton would not receive a raise because he was still earning his lead driver pay.  [Plaintiff disputes statement 18.  Harold Brown and Porter Beach, who are white, received raises after transferring from Lead Driver to Transport Driver positions.  Eric Meyer, who is white, received a raise at or about the same time that Pilot claims to have demoted Meyer from Lead Driver to Transport Driver (or not demoted according to Dyer's deposition).  Breeding approved each raise and "the buck stops with [Breeding]" on raises.  Breeding does not remember the substance of any of his conversations with Littleton, who is black, including the one in which he told Littleton that Littleton would continue to receive raises.  Furthermore, other than the sham Correction Notice issued to Littleton in October 2003, Littleton was never advised of any other deficiencies in his performance by either Dyer or Breeding.  Littleton was similarly situated to Brown and Beach, and more favorably situated than Meyer, but failed to receive the cost of living raise afforded to each of the white employees.]

19.   In February 2002, Littleton complained to Dyer about the fact that he did not receive a raise, and Dyer advised him that he would not receive a raise because he has been returned to a regular driver position, and he had to wait one year before receiving an increase.  [Plaintiff agrees that the incident and conversation took place.]

20.   At that time, Littleton did not believe that his race had anything to do with the decision not to give him a raise in 2002.  [Plaintiff agrees, but notes this was before he learned of the raises given to Brown, Meyer, and Beach.  It was also before Pilot issued the sham Correction Notice, before Pilot tried to "recreate" the circumstances of his transfer, before Pilot initially tried to hide Brown from the EEOC (never disclosed Beach), and took the other actions alleged by plaintiff.]

21.   In January 2003, Breeding decided that Littleton's wage rate would remain constant because he was still earning more than all the other drivers in West Memphis, with the exception of Clark, the lead driver.  Although Breeding was responsible for approving raises for transport drivers, Dyer agreed with Breeding's decision in Littleton's case.  [Plaintiff agrees that he failed to receive a raise on 2003, but otherwise disputes statement 21.  Breeding consciously decided to treat plaintiff differently than he had treated Brown, Beach, Meyer, who are each white, with respect to raises.]

22.   When Littleton discovered that he would not receive an increaser in 2003, Littleton contacted Breeding.  Breeding advised him that they had to "get [his wage rate] in line with the rest of the drivers" in West Memphis.  [Plaintiff agrees that he contacted Breeding and Breeding made the statement attributed to him.  Plaintiff disputes any implication that Breeding's statement was the real reason for the denial of plaintiff's case.]

-12-

23.  Littleton subsequently learned that Howard Brown, a transport driver and former lead driver in Tennessee, had received a raise two years after he was removed from the lead position. Because Brown is white, Littleton decided that Pilot was discriminating against him because he is black – and he did not receive a raise.  Littleton has no other evidence to support his discrimination claim.  [Plaintiff generally agrees, but denies that he has no other evidence to support his discrimination claim.  Defendant's statement takes one statement of plaintiff out of context and ignores the raises given to Beach and Meyer, the varying statement/reasons/excuses made by Pilot to Littleton, the EEOC, and the Court regarding Pilot's refusal to award Littleton his annual raise for 2002, 2003, and 2004 the retaliation against Littleton after he filed his EEOC charge, and the other evidence in the record and expected to be adduced at trial.  There is much more evidence in the possession of Littleton, his lawyers, and third parties to support Littleton's claim of discrimination.]

24.  On February 26, 2003, Littleton filed his Charge of Discrimination with the EEOC, asserting that "a similarly situated White male Truck driver was given a raise even though [Littleton] was told that Lead Drivers who return to a regular driver position could not receive a raise for the first year."  [Plaintiff agrees.]

25.  At this deposition, Littleton identified Eric Meyer, Howard Brown, and Porter Beach as "similarly situated" former lead drivers.  All three transport drivers are white.  [Plaintiff agrees.]

26.  Howard Brown has been employed as a driver for Pilot in Nashville, Tennessee since 1987. Pilot promoted Brown to lead driver in 1990.  Brown resigned his lead driver responsibilities in 2001 due to stress associated with the job.  [Plaintiff agrees, but notes that Brown was

initially not disclosed to the EEOC and Breeding's specificity in his affidavit is in marked contrast to his inability to remember much of anything in his deposition regarding Brown's transfer, raise, and pay.]

27. Brown did not receive a pay increase in 2001 following his resignation of lead driver responsibilities. In 2002, however, Brown received a 30 cent raise; Breeding decided to raise Brown's pay in consideration of his many years of outstanding service, In 2003, Brown received a 35 cent raise.  [Plaintiff agrees that Brown received a raise in 2002, but disputes the reason given by Breeding.  In his deposition, Breeding could not even remember the circumstances surrounding Brown's raise. Pilot further initially attempted to conceal Brown from the EEOC investigator.]

28. Eric Meyer, the former lead driver in West Memphis, received a 30 cent raise in January 2002, to $13.70 per hour.  [Plaintiff agrees that Meyer received a raise on January 31, 2002, perhaps in February 2002.  Meyer's employment file provided to the EEOC does not reflect when Meyer was demoted or transferred.]

29. Meyer was not demoted from the lead position until February 2002, however.  Similar to Littleton, Breeding held Meyer's wage rate flat after his demotion; he did not receive a raise in 2003 or 2004.  [Plaintiff generally agrees with the statement, but notes that Meyer's raise in 2002 was essentially simultaneous with his purported demotion.]

30. Littleton admits that it is possible that Meyer received his raise prior to his demotion. Littleton has no evidence to dispute Pilot's payroll records.  [Plaintiff disputes that there is no evidence to dispute Pilot's payroll records.  With respect to Meyer's raise in 2002, Meyer's Employment Action form is dated January 31, 2002, and it appears on the document

that whoever was completing the form initially started to date the form for February, which was scratched through.  At the very least it is a distinction without a difference because Pilot claim that job performance was part of its consideration in denying a raise to plaintiff, but at the same time it demoted Meyer it gave him a raise.]

31.    Porter Beach is employed as a transport driver in Chattanooga, Tennessee.  Littleton does not know when Beach was hired at Pilot or the circumstances that leads to his demotion form lead driver to transport driver.  [Plaintiff agrees, but notes that despite the statement, Pilot's representatives and employees stated that Beach received raises after moving from Lead Driver to Transport Driver and Pilot has never denied that Beach received raises after moving from Lead Driver to Transport Driver.]

32.    Littleton does not know what Beach earned as either a lead driver or transport driver. [Plaintiff agrees, but Beach received a raise after becoming a Transport Driver, which Dyer testified was a cost of living adjustment, consistent with Breeding's e-mail of April 3, 2002.]

33.    Pilot hired Beach as a lead driver in 1990.  He worked as a lead until 2000, when he resigned his lead responsibilities after having open heart surgery.  [Plaintiff agrees, but notes the marked contrast between Breeding's affidavit and his lack of memory during his deposition.]

34.    Littleton does no actually know whether Beach received regular raise following the resignation of his lead responsibilities. [Plaintiff believes that defendant's statement distorts his testimony.  Plaintiff was told by Pilot drivers in Chattanooga that Beach received raise after becoming a Transport Driver.  This was confirmed by Dyer.  In addition, despite numerous opportunities, Pilot has never denied that Beach received raises after moving form Lead Driver to Transport Driver.]

35.     Dyer has never used racist or inappropriate language with Littleton, and Littleton does not
        believe that Dyer is a racist.  Likewise, Breeding has never said anything to Littleton that
        leads him to believe that he is racist.  [Plaintiff agrees with the exception that the totality of
        Breeding's actions, the discriminatory conduct in refusing plaintiff's request for the same
        raise given to the white drivers, and the circumstances surrounding the sham Correction
        Notice, lead plaintiff to believe that Breeding's actions were racially motivated at least in
        part.  In addition, plaintiff reserves the right to call rebuttal witnesses if Breeding denies at
        trial having made statement to persons other than plaintiff.]

36.     Refusing to raise Littleton's wage rate is the only thing that Dyer or Breeding did to him that
        he believes was racially discriminatory.    [Plaintiff disputes statement 36 as a
        mischaracterization of the testimony and record as a whole.]

37.     Littleton does believe that Dyer did not respond appropriately to his complaints about Meyer.
        Littleton believes that Meyer damaged his truck and broke into his locker because Meyer
        suspected that Littleton was transferred to West Memphis to take his job.  [Plaintiff agrees.]

38.     Littleton also blames Dyer for mistakes that were made with respect to his payroll checks in
        late 2004.  If the truck's computer is not functioning, transport drivers report their hours to
        the lead driver, who reports the hours to Dyer, who forwards the information to payroll.
        When the electronic time-reporting system is functioning, Littleton's paycheck is always
        accurate.  [Plaintiff agrees.]

39.     Since Littleton did not experience errors in his payroll prior to the filing of his EEOC Charge
        with the EEOC. he believes that Dyer made these errors intentionally.  Littleton has no
        evidence that Dyer (or anyone else) intentionally manipulated his pay.  Whenever Littleton

-16-

advised Dyer of errors in his checks, Dyer corrects them; Littleton has always received his correct pay.  [Plaintiff agrees with the exception that the absence of any other employee experiencing the frequency of errors suffered by plaintiff, defendant's retaliation against him with the sham Correction Notice, defendant's lack of candor during the EEOC investigation, and the rest of the record also constitute evidence that not all of the errors in plaintiff's pay are unintentional.

40.     In August or September 2004, Littleton did not receive his paycheck; Dyer advised Littleton that he had forgotten to report Littleton's hours.  Dyer authorized the Travel Center to pay Littleton his missing wages.  [Plaintiff agrees.]

41.     Dyer has received complaints from multiple drivers, both white and blacks employees, regarding errors in their payroll that occur when the computer system is not automatically recording hours worked.  [Plaintiff disputes statement 41, at least as far as it implies that any other West Memphis employee has suffered the frequency of errors suffered by plaintiff.]

42.     In September 2003, six months after Littleton filed his Charge, Dyer spoke with Thomas Bradshaw, the manager of the West Memphis Pilot Travel Center.  Bradshaw advised Dyer that he has received complaints from a number of Travel Center employees about Littleton's conduct while he was in the Travel Center after he had unloaded fuel.  [Plaintiff disputes 42. Based on the dates of the statements, which are well *after* the Correction Notice was issued to plaintiff, the falsity of Pilot's initial statements to the EEOC regarding its investigation, the fact that Breeding told plaintiff that he did not care whether the charges were true or not, and other matters in the record, the jury should decide the credibility of Mr. Dyer's and Mr. Breeding's testimony.]

-17-

43.   Ben Crow, an assistant manager in the Travel Center, complained that Littleton had spread rumors around the store that Crow was stealing, and that he was gay.   In a statement submitted to Pilot management, Crow complained that he was subject to "constant harassment" by Littleton., and he identified other employees who had been subjected to mistreatment.   [Plaintiff disputes 43.]

44.   Bradshaw advised Dyer that he had spoken with other Travel Center employees, and they confirmed Crow's complaint.   [Plaintiff disputes 44.]

45.   At the time, Dyer was not aware that Littleton had filed Charge with the EEOC regarding his compensation.   He was concerned that Littleton would have any interaction with Travel Center employees because Littleton's duties generally did no require him to be in the Travel Center.   [Plaintiff disputes 45.   In its response to the EEOC regarding Littleton's retaliation charge, Pilot stated that its HR Department had affirmatively intervened to assure that no retaliation could have taken place.   The only reasonable inference is that HR, in taking affirmative action to protect plaintiff from retaliation would certainly have notified plaintiff's supervisors.   Further, Breeding and Dyer consulted regarding the Correction Notice, which was drafted and dictated by Parmly and approve by Breeding.   Breeding certainly knew of the EEOC charge and had provided information to Parmly to assist in Pilot's response (*e.g.*, without limitation).   The decision was ultimately Breeding's and Breeding stated that he did not care whether the allegations against plaintiff were true.]

46.   Dyer conferred with Breeding and David Parmly.   Pilot's Human Resources Manager, and he decided that Littleton should be counseled regarding his interactions with Travel Center employees.   [Plaintiff agrees that Breeding, Parmly, and Dyer conferred and conspired to

issue the sham Correction Notice, but notes that Pilot conducted no investigation at this point, later falsely claimed that it had investigated the matter, and Crow and the only complaining witnesses were after fired by Pilot for stealing and other improper conduct. Nonetheless, Pilot's Correction Notice remains in plaintiff's file and is a threat to plaintiff's continued employment.  This is also completely inconsistent with Pilot's contention that Dyer did not know about the EEOC charge.]

47.     Littleton learned about Crow's complaint to Bradshaw from Cedric Clark.  Littleton contacted Breeding about the issue, and Breeding advised him that Bradshaw had complained, that the Travel Center was their customer and that Dyer would be meeting with Littleton in West Memphis to resolve Bradshaw's concerns.  [Plaintiff agrees, but Breeding told Littleton that he did not care whether the allegations supposedly made by Bradshaw were true and the Correction Notice was issued without any investigation.]

48.     Dyer met with Littleton and Clark on October 2, 2003, to discuss the Travel Center employees' complaints.  Littleton responded to the allegations that had been made, and Dyer provided him with a Correction Notice that advised him that his conduct with the Travel Center employees had been improper.  [Plaintiff agrees that he met with Dyer and Clark on October 2, 2003, and was issued the Correction Notice but disputes the remaining statements in statement 48.]

49.     Littleton was not suspended, and he did not lose pay or benefits as a result of receiving this Notice.  He experienced no further difficulty or problems with his managers after receiving the Correction Notice.  [Plaintiff disputes 49 because the sham Correction Notice and defendant's failure to address the retaliation or discrimination, particularly in light of the fact

of defendant's efforts to falsely portray plaintiff as a problem employee after he filed his first EEOC charge, remain very real threats to his continued employment.  Obviously, the Correction remains a threat to plaintiff and, assuming that Mr. Parmly's statement that HR had intervened to ensure there was no retaliation is true, plaintiffs continues to be subject to the whims of Mr. Breeding who has stated at the time of the Correction Notice that he did not care if the allegations were true and testified in his deposition that he has seen nothing (notwithstanding the firing of Crow, Moore, and Shakleford, the statements of the other persons originally identified as witnesses, and the other matters in the EEOC record) to indicate that the allegations against Littleton were false.]

50.   The Correction Notice Littleton received on October 2, 2003, is the only incident that he describes as "retaliatory," based upon the filing of his EEOC Charge. [Plaintiff disputes 50. The large number of pay shortages, Pilot's efforts to falsely portray plaintiff as a problem employee, the contradictory and false statement to the EEOC during the investigation, the contradictory and false statements submitted to the court by Pilot, and Pilot's threat of attempting to recover its attorneys fees, among other things, could also be viewed as a continuation of Pilot's retaliatory conduct.  In addition, the idea that the sham Correction Notice, which was a blatant and transparent effort to set up plaintiff for termination, was "only" one incident is misleading.]

51.   Littleton denies that he has any kind of mental or physical impairment, and he denies that Pilot discriminated against him because of an actual or perceived impairment.  He has no reason to believe that any employment decision was made based upon his medical records, which he believes were improperly filed with his personnel records.  [Plaintiff agrees.]

52.     Littleton testified that his claim for "outrage" under Arkansas law is premised upon the same conduct underlying his race discrimination and retaliation claims.  He has felt "stressed" as a result of the alleged discrimination.  He has received no medical treatment or counseling of any kind for his alleged distress.  The only symptoms he can identify is difficulty falling to sleep, a couple times a month.  [Plaintiff agrees that his claim for outrage is premised upon the same conduct underlying the discrimination and retaliation claims.  Defendant actually appeared to agree with plaintiff in its EEOC response, in which it stated: "The Charging Party's assertion that white drivers are treated differently than blacks so that blacks wouldn't be 'more than them' is utterly objectionable and reflects a sentiment out of place in the modern work force."  Likewise, under Arkansas law using racial bias in employment decisions, falsification of personnel records, false statements to the EEOC, and retaliatory conduct by Pilot against plaintiff are utterly intolerable in civilized society.  The humiliation and embarrassment of a victim of racial discrimination has long been recognized as a matter of law.]

53.     Littleton remains employed at Pilot, and he is not interested in alternative employment, "[u]nless somebody pays [him] twice what [he's] making right now[.]"  He calculates that he has lost approximately $3,900 as a result of Pilot's allege discriminatory refusal to raise his wage rate.  [Plaintiff agrees, but does not limit his damages to the $3,900 lost as a result of the Pilot's refusal to provide raises to plaintiff.]

Additional facts deemed material by plaintiff follow:

54.     Littleton tried to complain to Dave Parmly in Human Resources about Pilot's discriminatory conduct, calling and leaving messages for Parmly on two different occasions, but Parmly never returned Littleton's call.

55.     Breeding never told Littleton that he was being demoted when Littleton was transferred from Troy, Illinois to West Memphis, and expressly assured Littleton that he would continue to receive his raise.  In fact, Littleton received a raise on January 11, 2001, after he had been in Troy for about three months.

56.     Littleton was the only driver in Troy, Illinois and did not supervise anyone.  Accordingly, Pilot's statements to the EEOC that Littleton "had not been performing well in his supervisory role", that Littleton was being "demoted" and that Littleton was being "allowed to keep 'supervisor pay' without any of the burdens of leadership that usually comes [sic] with supervision," were, at best, misleading.

57.     Moving from Lead Driver to Transport is not necessarily considered a demotion.  Littleton was the only one considered demoted from Lead Driver to Transport Driver.

58.     Dyer's and Breeding's statements that Littleton was demoted and that the transfer to West Memphis because they were dissatisfied with his performance in Troy, Illinois are false.

59.     Pilot uses no salary or wage survey, or economic index to determine drivers' wages and raises.

60.     An employee action form would ordinarily be filled out for a demotion, transfer, merit increase, and adjustment in pay.  Breeding ordinarily signs employee action forms, reads them before signing them, and would not knowingly sign an untrue employee action form.

61.    Breeding read and signed the employee action form when Littleton transferred from Troy, Illinois to West Memphis, and the information on the form was true and correct.

62.    Littleton was transferred to West Memphis from Illinois, but was not demoted.

63.    It would be reasonable for an employee to believe what either Breeding or Dyer told the employee.

64.    Breeding is familiar with the October 2, 2003 Correction Notice given to Littleton, and testified during his deposition that he referred Bradshaw's complaints to Dyer for Dyer to handle.

65.    In 2004 Pilot began paying everyone the same rate at each location with the exception of the lead driver.

66.    Breeding has no memory of his conversations with Littleton when Littleton was in Troy, Illinois.

67.    Other than the Correction Notice of October 2, 2003, Breeding did not know of any written or verbal notice to Littleton that his performance was unsatisfactory after Littleton transferred to West Memphis, and does not recall Dyer ever reporting Littleton's work performance was unsatisfactory.

68.    Breeding has no notes, diaries, or calendars to refresh his memory.

69.    Howard Brown has received pay raises after moving from Lead Driver to Transport Driver.

70.    Breeding does not know exactly, but Port Beach may have received raises after being moved from Lead Driver to Transport Driver.

71.    An Employee Action form would be completed for each driver receiving a raise and Breeding would have signed each such form.

72.   Breeding makes the decision about pay raises.

73.   Breeding knew about Littleton's EEOC charge and assisted in Pilot's response by preparing a memo for Mr. Parmly to use in Pilot's initial response, providing documents, and preparing a summary.  Breeding was aware of the first EEOC charge before the Correction Notice was issued, discussed it with Mr. Dyer, and agreed with Mr. Dyer's issuing the notice.

74.   Breeding testified that Tommy Bradshaw called Breeding to complain.

75.   Breeding does not remember what he told Dyer to do in conducting an investigation and does not even know if an investigation was conducted.  Breeding did not participate in an investigation of the complaints against Littleton.

76.   Dyer may have told Breeding what he did to investigate the accusation against Littleton, but Breeding does not remember.  Breeding also claims  not to remember if Littleton filed a second EEOC complaint, if he provided information to Parmly regarding the retaliation charge, or what he told Parmly if he did speak to Parmly.

77.   Breeding has not conducted any investigation since October 2, 2003, and is not sure if Dyer has.  Breeding did not nothing to determine whether the initial allegations against Littleton were correct.

78.   Breeding does not recall receiving any phone call or communication from Dyer since October 2, 2003, indicating that the allegations against Littleton were untrue.

79.   During the relevant times, Pilot gave pay raises to its drivers during the first quarter of each year in the form of a cost of living adjustment.  Breeding self-serving testimony and affidavit that the raise are merit based are false.

80.    In its response to the EEOC. Pilot initially failed to disclose that Howard Brown had been transferred from Lead Driver to Transport Driver, made more than plaintiff, and received raises after moving from Lead Driver to transport Driver.  Pilot later supplemented its information, but never did advise the EEOC about Porter Beach.

81.    In its response to the EEOC regarding Littleton's retaliation charge, Pilot stated that its HR Department had affirmatively intervened before issuing the Correction Notice to assure that no retaliation could have taken place.  However, each of the written statements submitted by Pilot as purported evidence of its investigation were dated about one month *after* plaintiff had filed his EEOC retaliation charges, omitted that defendant had not questioned the other person identified in the statements, omitted that other person identified as witnesses (*e.g.*, Mr. Cason ) had not even been questioned by Pilot and denied making the statements attributed to them by Pilot, and were made by persons ultimately fired by Pilot.

82.    Littleton's paycheck also began to be shorted on numerous occasions after he filed the initial EEOC charge.  He did not have any problems with his paycheck before filing the EEOC charge.

The very recent case of Rodgers v. U.S. Bank, N.A., 2005 WL 1844477, *3-6 (8th Cir. 2005) presents the following summary to be applied regarding burden of proof in discrimination cases and clarifying the standard to be applied to the pretext prong:

In this case, we employ the familiar McDonnell Douglas burden-shifting framework. Turner v. Honeywell Fed. Mfg. & Techs., LLC, 336 F.3d 716, 720 (8th Cir. 2003) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801- 04 (1973)). "Under the McDonnell Douglas framework, a presumption of discrimination is created when the plaintiff meets [her] burden of establishing a prima facie case of employment discrimination.  A minimal evidentiary showing will satisfy this burden of production."  Pope, 406 F.3d at 1006-07 (citations omitted).  Once the plaintiff establishes a prima facie case of discrimination, "[i]t then falls

to the employer to promulgate a non-discriminatory, legitimate justification for its conduct, which rebuts the employee's prima facie case." Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1111 (8th Cir. 2001) (citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993)). If the employer meets its burden, "the presumption of discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination." Pope, 406 F.3d at 1007. The plaintiff has the burden of persuasion at all times. Id.

B. Prima Facie Case of Discrimination

In order to establish a prima facie case of discrimination on the part of U.S. Bank, Rodgers must show that: (1) she is a member of a protected group; (2) she was qualified for her position; (3) she was discharged; and (4) the discharge occurred under circumstances giving rise to an inference of discrimination. See Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 944-45 (8th Cir. 1994). The parties agree that Rodgers satisfies the first three elements. Rodgers can prove the fourth element by putting forth facts that similarly situated employees, who are not African-American, were treated differently. Wheeler v. Aventis Pharms., 360 F.3d 853, 857 (8th Cir. 2004).

****

At the prima facie stage of the McDonnell Douglas burden-shifting framework, we choose to follow the low-threshold standard for determining whether employees are similarly situated. We believe this more accurately reflects Supreme Court precedent. The Supreme Court has advised: "The burden of establishing a prima facie case of disparate treatment is not onerous." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). We also think that using the low-threshold standard at the prima facie stage is more in line with our Court's prior admonition that "[t]he district court must not conflate the prima facie case with the ultimate issue of discrimination." Williams, 14 F.3d at 1308. Using a more rigorous standard at the prima facie stage would "conflate the prima facie case with the ultimate issue of discrimination," thereby effectively eliminating the burden-shifting framework the Supreme Court has directed us to use.

Under the low-threshold standard, Rodgers must show that she and Nichols were "involved in or accused of the same or similar conduct and [were] disciplined in different ways." Wheeler, 360 F.3d at 857 (quoting Williams, 14 F.3d at 1309). Rodgers satisfies this burden. Rodgers and Nichols are similarly situated because they both violated the same bank policy by processing transactions on their own accounts, and they were disciplined differently because Rodgers was terminated and Nichols received no punishment. As the district court points out, there are differences in the severity and frequency of their violations and the surrounding circumstances; however, these differences are relevant to the issue of whether Rodgers and Nichols are similarly situated for purposes of showing pretext. Accordingly, we hold that Rodgers has established a prima facie case of disparate treatment.

The burden of production now shifts to U.S. Bank to show that it had a legitimate, nondiscriminatory reason for terminating Rodgers.  U.S. Bank's proffered reason is that Rodgers violated the bank's policy against employees processing transactions on their own accounts.  "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence."  Floyd v. State of Missouri Dept. of Soc. Servs., Div. of Family Servs., 188 F.3d 932, 936 (8th Cir. 1999).  Accordingly, the ultimate burden falls on Rodgers to produce evidence sufficient to create a genuine issue of material fact regarding whether U.S. Bank's proffered nondiscriminatory reason is a pretext for discrimination.

C. Pretext

Rodgers attempts to prove pretext with evidence of the following: (1) disparate treatment of her and similarly situated white employees; (2) an inadequate investigation into her account activity; and (3) a substantial change in U.S. Bank's legitimate non-discriminatory reason for her termination.  We affirm the district court's grant of summary judgment to U.S. Bank because we conclude that Rodgers failed to raise a triable question of material fact as to whether U.S. Bank's legitimate nondiscriminatory reason for her termination was a pretext for discrimination.  [Footnote omitted.]

1. Disparate treatment

Rodgers attempts to prove disparate treatment by demonstrating that she was treated less favorably than similarly situated employees outside of her protected group.  See E.E.O.C. v. Kohler Co., 335 F.3d 766, 776 (8th Cir.  2003).  Specifically, Rodgers argues that she was terminated for violating the same U.S. Bank policy as Nichols, a white employee who was not disciplined for violating the policy.  She also argues that only white employees benefitted from U.S. Bank's progressive discipline policy.

Rodgers has failed to show that she was similarly situated to any of these white employees.  At the pretext stage of the McDonnell Douglas burden-shifting framework, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one.  See Wheeler, 360 F.3d at 857; Kohler, 335 F.3d at 775.  Rodgers must show that she and the employees outside of her protected group were similarly situated in all relevant respects.  Wheeler, 360 F.3d at 858.

Here, as plaintiff was not discharged, the factors would slightly change.  "This analysis first requires the plaintiff to establish a prima facie case of sex discrimination, thus demonstrating that he or she (1) is a member of a protected class; (2) was qualified to perform her job; (3) suffered an

adverse employment action; and (4) was treated differently that similarly-situated persons of the opposite sex.  See id. at 1156." Schoffstall v. Henderson, 223 F.3d 818, 825 (8th Cir 2000).

The Court is persuaded that plaintiff has made his prima facie case that he was treated differently in not receiving raises and that defendant has shown that it had a legitimate, nondiscriminatory reason for holding his wages flat due to complaints by co-drivers.  Although defendant has strongly argued that Beach and Brown are not proper comparators, the Court is persuaded that plaintiff still has presented material issues of fact regarding pretext that must be resolved regarding what plaintiff was told about his wages when he moved from Troy to West Memphis, whether that move was a transfer or a demotion, the standard utilized in determining raises including Beach and Brown, and especially the issue including timing of raises for Meyer.  The Court finds that the exhibits do present conflicts about these matters that can only be resolved by credibility determinations at trial.

The case of Hunt v. Nebraska Public Power Dist., 282 F.3d 1021, 1028 (8th Cir. 2002), provides the applicable legal standard on the retaliation claim:

> Title VII prohibits employers from retaliating against an employee who is engaged in a protected activity, which can be either opposing an act of discrimination made unlawful by Title VII ("the opposition clause"), or participating in an investigation under Title VII ("the participation clause").  See Brower v. Runyon, 178 F.3d 1002, 1005 & n. 3 (8th Cir. 1999) (affirming summary judgment for defendant because plaintiff failed to establish prima facie case of retaliatory discrimination).  To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) she was engaged in a protected activity (opposition or participation); (2) she suffered an adverse employment action; and (3) the adverse action occurred because she was engaged in the protected activity. See Coffman v. Tracker Marine, 141 F.3d 1241, 1245 (8th Cir. 1998) (Coffman) (affirming district court's denial of employer's motion for judgment as matter of law).  Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defense to produce a nondiscriminatory reason for the adverse employment action. See id.  Then, the burden shifts back to the plaintiff to show that the defendant's proffered reason was pretextual.  See id.

Earlier this year, the appellate court in <u>Okruhlik v. University of Arkansas</u>, 395 F.3d 872, 879 (8th Cir. 2005), discussed adverse employment action as follows:

> A plaintiff suffers an adverse employment action when the action results in a "material employment disadvantage" such as " '[t]ermination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects.' " <u>Duncan v. Delta Consol. Indus.</u>, 371 F.3d 1020, 1026 (8th Cir. 2004) (quoting <u>Spears v. Mo. Dep't of Corrs. & Human Res.</u>, 210 F.3d 850, 853 (8th Cir. 2000)).

See also, <u>Sallis v. University of Minn.</u>, 408 F.3d 470, 476 (8th Cir. 2005) ("'Mere inconvenience without any decrease in title, salary, or benefits is insufficient to show an adverse employment action.' <u>Cruzan v. Special Sch. Dist. # 1</u>, 294 F.3d 981, 984 (8th Cir. 2002)."); <u>Ledergerber v. Stangler</u>, 122 F.3d 1142, 1144 (8th Cir. 1997)("<u>Spring v. Sheboygan Area Sch. Dist.</u>, 865 F.2d 883, 886 (7th Cir. 1989) (finding 'public humiliation' is not sufficient to establish age discrimination because 'public perceptions were not a term or condition of [the plaintiff's] employment').).

More specifically, in <u>Henthorn v. Capitol Communications, Inc.</u>, 359 F.3d 1021, 1028 (8th Cir. 2004), the Eighth Circuit stated that:

> A negative employment review, for example, is actionable only if the employer subsequently uses the evaluation as a basis to alter in a detrimental way the terms or conditions of the recipient's employment.  <u>Spears v. Mo. Dep't of Corr. & Human Resources</u>, 210 F.3d 850, 854 (8th Cir. 2000).

See also, <u>Ledergerber v. Stangler</u>, <u>supra</u> at 1145 ("Further, the placement of the notice in appellant's file that discrimination is an unlawful employment practice did not constitute an adverse employment action.").

Although plaintiff disagrees with the Correction Notice and has presented evidence as to the accuracy of the investigation and later developments regarding certain Travel Center employees who

had complained or supported that complaint, the record shows that there was a complaint – whether true or not – against plaintiff by the Travel Center manager – of whom there is no evidence that he was aware of any protected activity by plaintiff – which was reported to defendant.  However, more significant, the Correction Notice simply does not rise to the level of an adverse employment.  While plaintiff argues that the Correction Notice is a threat to plaintiff's continued employment, there is no evidence, as required by the appellate court, that defendant has subsequently used the Correction Notice to alter plaintiff's employment.

On the issue of his pay checks being shorted after his February 2003 EEOC charge and plaintiff then having to ask that the matter be corrected, plaintiff has not disputed that other employees – both black and white – have experienced errors in their payroll although he does dispute the frequency of those errors compared to his.  However, plaintiff was only able to specify an incident in November 2004 as well as one in August or September of 2004.  His testimony further reveals that the errors only occurred when the Zeta machine that allows him to electronically report his hours was not working so that he had to orally report them through his lead driver to Dyer and then to payroll.

The Court cannot find that plaintiff has met his initial burden as to both the adverse action and causal prongs for retaliation.  He was expressly questioned in his deposition as to specific instances and was only able to identity two which were 18 months after the filing of the EEOC charge.  Moreover, he admits that other drivers also experienced errors while contending that the errors were less frequent for them.  However, plaintiff has not presented any proof to support his contention regarding frequency of his errors compared to others.  See, Bass v. SBC Communications, Inc., ____ F.3d ____,  2005 WL 1903734, *2 (8th Cir. 2005):

In response, Bass offered no rebuttal medical evidence, but relied solely on his own statements that he could have returned to work during the month of August. These statements are insufficient to avoid summary judgment. See <u>Mayer</u>, 318 F.3d at 809 ("[e]vidence, not contentions, avoids summary judgment"). While Bass asserts that his personal physician released him to return to work, Bass did not produce a return to work release or an affidavit or deposition from his physician to support his contention.

The Eighth Circuit discussed the Arkansas tort of outrage in the following excerpts from

<u>Kelley v. Georgia-Pacific Corp.</u>, 300 F.3d 910, 912-913 (8th Cir. 2002):

> Under Arkansas law, to establish a claim for outrage a plaintiff must prove the following:
>
>> (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous, was beyond all possible bounds of decency, and was utterly intolerable in a civilized community; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it.
>
> <u>McQuay v. Guntharp</u>, 331 Ark. 466, 470, 963 S.W.2d 583, 585 (1998) (internal quotations omitted). Merely describing certain conduct as outrageous does not make it so under Arkansas law. <u>Renfro v. Adkins</u>, 323 Ark. 288, 914 S.W.2d 306, 312 (1996). The District Court correctly pointed out that the standard that a plaintiff must meet in order to satisfy the elements of outrage in Arkansas "is an exceptionally high one." D. Ct. Op. 5. See <u>Poindexter v. Armstrong</u>, 934 F.Supp. 1052, 1057 (W.D. Ark. 1994). Additionally, in the employment context the standard is even higher. <u>Palmer v. Arkansas Council on Economic Education</u>, 344 Ark. 461, 40 S.W.3d 784 (2001). The District Court determined that the allegedly outrageous acts that Mr. Kelley complained of did not rise to the strict standard necessary to establish a claim of outrage. We agree and affirm.
>
> ****
>
> This conduct falls short of the standard necessary to sustain a claim of outrage. See <u>Palmer</u>, 344 Ark. at 474-75, 40 S.W.3d at 792 (finding insufficient evidence to support claim of outrage when employee, after 31 years on the job, received improper written reprimand, was improperly placed on probation, and was wrongfully terminated). Therefore, summary judgment was appropriate on the outrage claim.

Once again, the Court has carefully considered the exhibits in light of the parties' arguments.

When the "exceptionally high" standard is applied to plaintiff's claim of denial of raises as well as

the issuance of the Correction Notice and pay errors – both of which the Court found failed to raise

to the level of adverse actions, the Court finds that these allegations do not meet that high standard

required to satisfy the elements of outrage in Arkansas.

Accordingly, defendant's May 9th motion (#17) for summary judgment is granted in part,

denied in part, and rendered moot in part. Plaintiff is permitted to dismiss his ADA claim without

prejudice. Summary judgment is granted in favor of defendant on the claims of retaliation and

outrage, but denied as to race discrimination in denial of raises.

IT IS SO ORDERED this 15th day of August, 2005.


_____
UNITED STATES DISTRICT JUDGE